# STATE OF CONNECTICUT *v.* EDWARD R. DALZELL
## (AC 26255)

Bishop, McLachlan and Dupont, Js.

Argued February 22—officially released July 18, 2006

*Elizabeth M. Inkster*, senior assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Stephen J. Sedensky III*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Edward Dalzell, appeals from the judgment of conviction rendered following his conditional plea of nolo contendere to possession of narcotics with the intent to sell in violation of General Statutes § 21a-277 (a), possession of narcotics in violation of General Statutes § 21a-279 (a), possession of drug paraphernalia in violation of General Statutes § 21a-267 (a), operating a motor vehicle while under the influence of drugs in violation of General Statutes § 14-227a (a) and failure to wear a seat belt in violation

of General Statutes § 14-100a (c) (1). The plea followed a denial of the defendant's motions to suppress.[1] The defendant received a total effective sentence of five years incarceration on the first four counts, and a $15 fine was remitted on the fifth count. On appeal, the defendant claims that the trial court improperly denied his motions to suppress because the stop of his motor vehicle for his failure to wear a seat belt was pretextual, and the subsequent search of his vehicle constituted an unreasonable search and seizure under article first, §§ 7 and 9, of the Connecticut constitution.[2] We reverse the judgment of the trial court in part and remand the case with direction to grant the defendant's motions to suppress.

The only witness to testify at the suppression hearing was Adam Marcus, a police officer with the Danbury

[1] General Statutes § 54-94a and Practice Book § 61-6 (a) (2) (i) allow a plea of nolo contendere conditional on the right to file an appeal from the denial of a motion to suppress on the basis of an unreasonable search or seizure.

The defendant filed motions to suppress tangible evidence and statements, all on the basis that the evidence and statements were obtained in violation of the fourth and fourteenth amendments of the federal constitution and article first, §§ 1, 7, 8 and 9, of the state constitution. The defendant does not make any federal constitutional claims on appeal, relying solely on article first, §§ 7 and 9, of the state constitution. He fears that under federal constitutional law his claims would fail. We resolve these issues under the state constitution, although recognizing that under federal constitutional principles he might also prevail. See *State* v. *Santos*, 267 Conn. 495, 497, 838 A.2d 981 (2004). In this case, on the basis of its facts, it is difficult to conclude that the meaning or the application of the provisions of the fourth amendment to the federal constitution and those of article first, §§ 7 and 9, of the Connecticut constitution differ in any meaningful way. See *State* v. *Trine*, 236 Conn. 216, 230, 673 A.2d 1098 (1996).

[2] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

police department. Marcus testified that, at approximately noon on February 27, 2004, he observed the defendant driving a 1991 Ford Escort on Town Hill Avenue in Danbury. Marcus followed the defendant for approximately one mile after he observed that the defendant was not wearing a shoulder harness type of seat belt.[3] Marcus followed the defendant along Town Hill Avenue to the stop sign at Liberty Street. The defendant stopped and turned left at Old Oak Restaurant & Pizzeria. Marcus continued to follow the defendant along Liberty Street. The defendant, with Marcus following, traveled along Liberty Street and proceeded straight onto Patriot Drive at the intersection where Liberty Street turns left. Traveling along Patriot Drive, the defendant proceeded along Balmforth Avenue where it intersects Patriot Drive and White Street. Somewhere after the area on Balmforth Avenue where train tracks intersect, Marcus stopped the defendant's vehicle. During the time Marcus followed the defendant, he did not observe the defendant violate any traffic rules. Marcus testified that the defendant must have observed all posted signs, speed limits, traffic control signals and markings because otherwise he would have stopped the defendant before and made a note in his

---

[3] Marcus stated that, prior to approaching the vehicle on foot after he had stopped the defendant, he had no way of knowing whether the defendant was wearing a lap type seat belt. After approaching the vehicle, Marcus confirmed his suspicion that the defendant was not wearing a seat belt, either the shoulder type or lap type. The defendant's vehicle was equipped with separate lap belts and shoulder harnesses. The defendant's argument for an unconstitutional, pretextual stop includes his claim that no violation of the seat belt statute is possible unless the officer knew prior to the stop that both the lap belt and shoulder harness were not fastened.

Failure to wear a seat belt is a violation of General Statutes § 14-100a (c) (1), (4), which constitutes "an infraction" and provides that the violator "shall be fined fifteen dollars. . . ." General Statutes § 54-33m provides: "The failure of an operator of, or front seat passenger in, a private passenger motor vehicle or vanpool vehicle to wear a seat safety belt as required by section 14-100a shall not constitute probable cause for a law enforcement official to conduct a search of such vehicle and its contents."

report. Marcus also testified that in the past, he had observed other drivers not wearing seat belts and had not stopped them.

Once stopped, Marcus checked the defendant's license plate with the police dispatcher, which provided him with information that the vehicle was validly registered. According to Marcus, he received no other information about the defendant prior to approaching the vehicle,[4] and, as he approached the defendant's vehicle, he was not in fear of his safety. Marcus exited his vehicle, approached the defendant's vehicle, notified the defendant that he was being stopped for failure to wear a seat belt and requested the defendant's license, registration and proof of insurance. The defendant, attempting to satisfy Marcus' request, removed an envelope from his glove compartment that had several different papers in it. As the defendant surveyed the papers, Marcus examined the defendant. Marcus observed that it was a clear, sunny day in February and that the defendant was not wearing sunglasses. According to Marcus, the defendant's eyes were contracted and his nose was red around the nostrils and running.[5] Marcus testified that the defendant "appeared, like, slow and lethargic" because he passed over his registration several times while looking for all of the documentation requested by the officer and because it was taking the defendant "a few seconds" but less than one full minute to retrieve

[4] The defendant previously had been convicted of possession of narcotics in violation of General Statutes § 21a-279 (a) on September 23, 1997, and September 16, 1998. Marcus testified that prior to stopping the defendant's car, he did not recall if he had "run the defendant's plate," and he testified that he did not know anything, other than the defendant's name and the make of the car, after checking the defendant's license plate with the police dispatcher at the time of the stop.

[5] Marcus testified that his training and experience taught him that persons under the influence of opium based narcotics exhibit contracted pupils and that red nostrils and a runny nose are indicators that a person has inhaled narcotics through their nose.

the documentation. At the same time, Marcus observed a rolled up dollar bill in the square area of the center console between the two seats.[6] After the defendant retrieved the requested information, Marcus asked the defendant whether he had used narcotics. The defendant replied, "No, and I'm not getting out of the vehicle, so start writing me a ticket." Marcus informed the defendant that he suspected that the defendant was under the influence of narcotics and requested again that the defendant exit the vehicle. The defendant refused to exit. Marcus opened the door to the vehicle, grabbed the defendant by the arm, escorted him out of the vehicle and placed him under arrest for operating a motor vehicle while under the influence of drugs.[7]

Marcus then performed an inventory search of the defendant's vehicle because he decided to impound the car.[8] Marcus secured the dollar bill that he had previously viewed from outside the vehicle. Once in possession of the dollar bill, Marcus observed that it had white residue on it. The residue was later field tested and tested positive for heroin. In the vehicle, Marcus also discovered a cigarette pack that contained four small glassine packets that were stamped "red devil" in red ink and contained white powder. A field test of that substance indicated that it was heroin. The defendant was subsequently charged with possession of narcotics, possession of drug paraphernalia, operating a

---

[6] From his vantage point, Marcus could not see if there was any residue on the bill, which might indicate that it had been used to inhale narcotics.

[7] Marcus testified that he was not in any greater fear of his safety during the stop than compared to a normal traffic stop and that the defendant, although he refused to exit his vehicle, never resisted or struggled with Marcus.

[8] Marcus testified that in the past, he had allowed the car of a person who had been arrested, under similar circumstances, to be driven away by a friend of the person who had been arrested if the car was not part of a crime or a crime scene. Nevertheless, in this case, he failed to give the defendant that option and ordered the car impounded, which made an inventory of its contents necessary.

motor vehicle while under the influence of drugs and failure to wear a seat belt.

On August 25, 2004, the defendant filed three motions to suppress. Following an evidentiary hearing, the court denied the defendant's motions to suppress. The court stated in its memorandum of decision that there was "a credible foundation for the stop . . . ." The court also commented on the arrest for operating a motor vehicle while under the influence of drugs: On the basis of "the conduct of the defendant, his speech, his behavior, his demeanor, the presentation of his eyes, the runny nose and the like," as well as the rolled up dollar bill in plain view, Marcus reasonably concluded that the defendant had operated a motor vehicle while under the influence of intoxicating substances. According to the court, "[e]verything that flows from that—search incident to the arrest, inventory of a vehicle which is part of the arrest process, all those things flow from what is considered to be, at least under our practice, to be reasonable conduct for a police officer in conducting a follow-up investigation."

On appeal, the defendant asserts that there was no reasonable and articulable suspicion that he was not wearing a seat belt to justify the initial stop. The defendant further argues that, even if there was a reasonable and articulable suspicion on which the officer could have effected a valid stop for a seat belt violation, the stop was pretextual because the real reason for the stop was to search for, and to obtain, evidence of an unrelated crime or crimes. The defendant also contends that even if the initial stop was justified and not pretextual, Marcus never had probable cause to arrest the defendant for operating a motor vehicle while under the influence of drugs or to search the vehicle.

"As an initial matter, we note that [o]ur standard of review of a trial court's findings and conclusions in

connection with a motion to suppress is well defined. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 92, 890 A.2d 474 (2006). "Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Weaver*, 85 Conn. App. 329, 335, 857 A.2d 376, cert. denied, 271 Conn. 942, 861 A.2d 517 (2004); see also 5 W. LaFave, Search and Seizure (3d Ed. 1996) § 11.7 (c), pp. 399–400.

Our plenary review of the defendant's claim that the court's denial of his motions to suppress violates our state constitution includes the following tools of analysis: (1) the particular facts of the case; (2) the test of the relevant statutory or constitutional provision; (3) prior holdings and dicta of the Connecticut appellate courts; (4) federal precedent; (5) decisions of other state courts; and (6) historical and socioeconomic considerations. *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992).

"It is well settled that we are not bound by the decisions of the United States Supreme Court in interpreting the contours of article first, §§ 7 and 9. . . . It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . In [state] constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as

their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . Recognizing that our state constitution is an instrument of progress . . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally . . . we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilkins*, 240 Conn. 489, 504–505, 692 A.2d 1233 (1997).

The defendant argues that there was no reasonable and articulable suspicion to justify the initial stop because he could have committed the infraction only if both his shoulder harness and also his lap belt were unfastened. Specifically, the defendant claims that on the basis of the totality of the circumstances, there was no reasonable and articulable suspicion that he was violating § 14-100a (c) and that, therefore, the stop was pretextual.

"Article first, §§ 7 and 9, of our state constitution permit a police officer in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes even though there is no probable cause to make an arrest . . . . In determining whether the detention was justified in a given case, a court must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . These standards, which mirror those

set forth by the United States Supreme Court in *Terry* v. *Ohio*, [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9, of our state constitution." (Internal quotation marks omitted.) *State* v. *Wilkins*, supra, 240 Conn. 507–508.

"An investigatory stop is authorized if the police officer had a reasonable and articulable suspicion that a person has committed or is about to commit a crime." (Internal quotation marks omitted.) *State* v. *Bolanos*, 58 Conn. App. 365, 368, 753 A.2d 943 (2000). "When a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his suspicions." *State* v. *Wilkins*, supra, 240 Conn. 495. "A police officer has the right to stop a motor vehicle operating on a Connecticut highway even if the reason for the stop is only an infraction under our traffic laws." *State* v. *Dukes*, 209 Conn. 98, 122, 547 A.2d 10 (1998). Failure to wear a seat belt is an infraction that is clearly prohibited under Connecticut law. General Statutes § 14-100a (c). Here, Marcus observed that the defendant was operating a motor vehicle without wearing a shoulder harness type of seat belt. Applying the objective standard to these circumstances, we conclude that there was a reasonable and articulable suspicion that the defendant was violating § 14-100a (c). The initial investigatory stop, as a result, was justified.

The defendant also argues that, even if there was a reasonable and articulable suspicion on which Marcus could have effected a valid stop for a seat belt violation, the stop of his car was also pretextual because the real reason for the stop was to obtain or to search for evidence of an unrelated crime or crimes. The defendant asks this court to hold that it is the subjective intent of law enforcement officers that should govern

whether the motor vehicle traffic stop was pretextual and violative of §§ 7 and 9 of the Connecticut constitution, although he admits that *Whren* v. *United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), used an objective standard to test whether the action of the law enforcement officer violated the fourth amendment to the federal constitution.

The state contends that this claim of pretext should not be reviewed for three reasons. It argues that the claim is unpreserved and was waived. The state also argues that this claim is dependent on factual findings of the intent of the officer in stopping the defendant that were not made by the court and that, therefore, there is a lack of an adequate record for review. The state further claims that, even if the question is reviewable, the initial stop was not pretextual under our state constitution.[9]

Contrary to the state's argument, the defendant did preserve the issue at trial. His written motions to suppress and the evidentiary hearings following the motions clearly state and argue, respectively, that he claims both state and federal constitutional protection. Furthermore, a review of the entire transcript of the hearings on the motions to suppress shows that the defendant did not waive his claim of a pretextual stop. The state cites a portion of the transcript from the suppression hearing to substantiate its claim of waiver by the defendant. The comment of defense counsel cited by the state is that he would not want to address the issue of whether a pretextual stop occurred, but that comment was made immediately after the court had asked if there was a claim of racial profiling here as the pretext for the stop, and counsel had said no. Reasonably interpreted, together with the many other

---

[9] The defendant ignores those Connecticut cases that also use an objective standard. See footnote 10.

references to pretextual stops in the transcript, the remark indicates only that counsel did not claim that the stop was made because of the defendant's race and that, therefore, the stop was pretextual for that particular reason. Even if the defendant had not preserved the issue at trial, appellate review would be warranted because the issue is of constitutional magnitude and the record is adequate for review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[10] On the basis of the record in this case, no Connecticut constitutional violation occurred because there was a reasonable and articulable suspicion of a violation of the seat belt statute and no indication at all of any ulterior or different motive of the officer for the stop.

The defendant also asserts that, under the totality of the circumstances, there was no probable cause to believe that he was operating a motor vehicle under the influence of drugs. The defendant brings this claim under the protections of article first, §§ 7 and 9, of the Connecticut constitution, fearing that *Atwater* v. *Lago Vista*, 532 U.S. 318, 121 S. Ct. 1536, 149 L. Ed. 2d 549

---

[10] The state argues that the record is inadequate for review because the court made no findings as to any subjective motivation of the police officer for stopping the car. A reasonable and articulable suspicion that a traffic violation has occurred is, under the fourth amendment, an objective standard that does not focus on the actual state of mind of a police officer, but on whether a reasonable person's suspicion would have been raised, having the information known to the officer. *State* v. *Colon*, 272 Conn. 106, 149, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); see also *Whren* v. *United States*, supra, 517 U.S. 812. The subjective motivation of the police officer to stop the defendant for a violation of the seat belt law is, therefore, irrelevant, and no findings were necessary under either federal or state constitutional law. The standard in Connecticut for determining whether there has been a reasonable and articulable suspicion for a motor vehicle violation stop is the same as the standard employed under the federal constitution. See, e.g., *State* v. *Torres*, 230 Conn. 372, 382–83, 645 A.2d 529 (1994); *State* v. *Lamme*, 216 Conn. 172, 579 A.2d 484 (1990); *State* v. *Dukes*, supra, 209 Conn. 122. A review of the record does not support any pretextual motivation of the officer.

(2001), controls the present case under the federal constitution.[11] If the full custodial arrest for operating a motor vehicle while under the influence of drugs is to withstand a state or federal constitutional attack, the circumstances, in their totality, must provide a basis for the expansion of the scope of the initial investigatory stop for an infraction.

In order for a warrantless arrest to be valid, it must be supported by probable cause. *State* v. *Trine*, 236 Conn. 216, 236, 673 A.2d 1098 (1996). "The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state constitution, is made pursuant to a 'totality of circumstances' test." *State* v. *Velasco*, 248 Conn. 183, 189–90, 728 A.2d 493 (1999); see also *State* v. *Barton*, 219 Conn. 529, 544–45, 594 A.2d 917 (1991). "Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a [crime] has been committed." (Internal quotation marks omitted.) *State* v. *Trine*, supra, 236–37. "The probable cause test then is an objective one." (Internal quotation marks omitted.) Id., 237.

[11] *Atwater* involved a civil action to recover damages on the basis of an alleged detention and subsequent warrantless arrest for a seat belt violation. The United States Supreme Court concluded that if a person has committed a misdemeanor seat belt violation, the suspect may be detained and arrested without any fourth amendment violation. *Atwater* v. *Lago Vista*, supra, 532 U.S. 354. Although the United States Supreme Court correctly cites Connecticut's statute authorizing warrantless misdemeanor arrests in its appendix to the opinion for its proposition that all fifty states permit such arrests in some circumstances, *Atwater* does not control the outcome of the present appeal. The state jurisdiction involved in *Atwater*, unlike Connecticut, designated seat belt violations as misdemeanors, for which an arrest is allowed. Connecticut, however, treats the motor vehicle equipment violation of failure to wear a seat belt as an infraction for which no arrest is authorized. See General Statutes § 14-100a (c) (4); Practice Book § 44-23. A resident of Connecticut charged with an infraction involving a motor vehicle shall not be taken into custody. Practice Book § 44-23.

Here, the totality of the circumstances must have provided probable cause to believe that the defendant was operating a motor vehicle while under the influence of drugs in order for the arrest to survive a state constitutional attack. There is a difference between the standard of review to determine whether a reasonable and articulable suspicion exists to justify a brief investigatory detention and the standard used to determine whether probable cause to arrest exists. See id., 235. "Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . The probable cause determination is, simply, an analysis of probabilities. . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." (Internal quotation marks omitted.) *State* v. *Eady*, 249 Conn. 431, 440, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999). Probable cause requires more than reasonable suspicion. *State* v. *Trine*, supra, 236 Conn. 235–37. The standard of proof for the constitutional validity of the arrest for operating a motor vehicle while under the influence of drugs is whether probable cause existed and is not the same test of reasonable and articulable suspicion that is used to determine whether the stop for a failure to wear a seat belt was valid.

In order to determine whether the officer had probable cause to arrest the defendant for operating a motor vehicle while under the influence of drugs, we briefly review the elements of that crime. A driver operating a motor vehicle while under the influence of a drug is one whose mental, physical or nervous processes have become so affected that he lacked to an appreciable degree the ability to function properly in the operation

of his vehicle. *State* v. *Gordon*, 84 Conn. App. 519, 526, 854 A.2d 74, cert. denied, 271 Conn. 941, 861 A.2d 516 (2004). Typical indicia of the inability to function as a driver because of the intoxicating effect of drugs or alcohol include whether a defendant smells of the drug, has slurred speech, fumbles in retrieving paperwork, has glassy and bloodshot eyes, admits that he has, while driving, been using drugs or fails sobriety tests. Id., 528. Most importantly, the main indicia of intoxication relates to the ability to operate the vehicle without committing traffic violations. See *State* v. *Lamme*, 216 Conn. 172, 579 A.2d 484 (1990).

After approaching the vehicle, Marcus made several observations that he cited in his testimony as arousing his suspicion that the defendant was operating his motor vehicle under the influence of intoxicating drugs. Marcus observed that the defendant's pupils were contracted, his nose was red around the nostrils and running, it was taking more than a few seconds but less than one minute for the defendant to retrieve his license, registration and proof of insurance, and there was a rolled-up dollar bill in the center console of the vehicle. On the basis of these observations, Marcus informed the defendant that he suspected the defendant of driving while under the influence of narcotics, which the defendant denied. The defendant refused to participate in a field sobriety test. Marcus articulated those facts as the basis for his arrest of the defendant for operating a motor vehicle while under the influence of drugs.

The circumstances, recited by Marcus, significantly, did not include his observations while following the defendant for more than a mile along various roads in Danbury. During this time, the defendant used his signals correctly and observed all posted signs, speed limits, traffic control signals and markings. According to Marcus, if the defendant had committed any motor vehicle violations, he would have stopped the defendant

before and made a note in his report that the defendant had committed a moving violation. Despite the defendant's acceptable driving while Marcus followed him, Marcus pieced together four otherwise innocuous facts to form the probable cause for an arrest of the defendant.[12] To arrive at the conclusion that probable cause existed, one must ignore the fact that, except for the seat belt violation, the defendant operated his motor vehicle in a manner consistent with that of an ordinary, careful and prudent driver over a considerable distance on multiple city roads.

Although we recognize that there are instances in which Marcus' four observations might create probable cause to believe that a person is under the influence of intoxicating substances, this is not one of those instances. We cannot separate the four facts observed by Marcus, all of which are indistinguishable from otherwise innocent conduct, from the fact that he followed the defendant over a considerable distance along a winding path of intersecting roads beset with stops and traffic signals without observing any traffic violation. Under the totality of the circumstances, the officer's

---

[12] The determination of probable cause was dependent entirely on facts that do not point any more in the direction of criminal behavior than in the direction of entirely benign circumstances. For instance, as the officer conceded, the defendant's contracted pupils could have been due to the fact that it was a sunny day and the defendant was not wearing sunglasses, the defendant's runny nose and irritated nostrils were symptoms indistinguishable from those suffered by a person with a cold and the defendant's delay while retrieving his license, insurance and registration, which amounted to a matter of seconds, was not unusual, given the uncommon occurrence of a police stop. Moreover, the presence of a rolled up dollar bill in a console commonly used to store loose change and small bills does not indicate drug use rather than an innocuous reason for the location of the money in the vehicle's console. These noninculpatory findings, when coupled with the fact that the officer followed the defendant for one mile while observing that he obeyed all posted signs, speed limits, traffic control signs and markings, and operated his vehicle in an entirely proper manner, do not afford a basis for a probable cause determination that the defendant was operating a motor vehicle while under the influence of drugs.

conclusion that there was probable cause for the arrest of the defendant for operating a motor vehicle while under the influence of drugs must fail.

The defendant was also arrested for possession of a narcotic substance, possession of a narcotic substance with the intent to sell and possession of drug paraphernalia. At the time of the stop, nothing in plain view and no observation of the defendant indicated that there was probable cause or a reasonable or articulable suspicion that any of the latter crimes had been committed. If the only charge had been the noncriminal charge of failure to wear a seat belt, even under federal constitutional principles, any search of the car without consent would have violated the fourth amendment to the United States constitution, and the motion to suppress the drugs found would have been granted.[13] See *Knowles* v. *Iowa*, 525 U.S. 113, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998); see also *Arkansas* v. *Sullivan*, 532 U.S. 769, 121 S. Ct. 1876, 149 L. Ed. 2d 994 (2001). We also conclude that the same result would be true, as the defendant argues, under the state constitution. Before the search of the car, there was no reasonable and articulable suspicion or probable cause to believe that the defendant had committed or was about to commit the crimes of possession of a narcotic substance, possession of a narcotic substance with the intent to sell or possession of drug paraphernalia.

Since 1985, a long line of Connecticut appellate cases has recognized the efficacy of §§ 7 and 9 of the Connecticut constitution, as opposed to the federal constitution, to provide for enhanced rights to prevent the use of evidence obtained, after a legal detention, unless there

---

[13] In *Knowles* v. *Iowa*, 525 U.S. 113, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998), decided two years after *Whren*, a unanimous Supreme Court held that a nonpretextual stop for speeding could not be enlarged into a search of the suspect's car unless the law enforcement officer feared for his safety or needed more evidence for the crime for which the motorist was stopped.

is a reasonable and articulable suspicion or probable cause that a crime has been committed or is about to be committed. See, e.g., *State* v. *Santos*, 267 Conn. 495, 838 A.2d 981 (2004); *State* v. *Wilkins*, supra, 240 Conn. 504–508; *State* v. *Miller*, 227 Conn. 363, 630 A.2d 1315 (1993); *State* v. *Lamme*, supra, 216 Conn. 172; *State* v. *Kimbro*, 197 Conn. 219, 233, 496 A.2d 498 (1985). Justice Arthur Healey, writing for the court in *State* v. *Dukes*, supra, 209 Conn. 115, recognized an immutable concept. "The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." The words of article first, § 7, of our state constitution, that "[t]he people shall be secure in their persons . . . and possessions from unreasonable searches and seizures," and the words of article first, § 9, that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law" have present day significance.

We conclude that there was an objective justification for the arresting officer to stop the defendant for failure to wear a seat belt, which was reasonable and articulable, but that there was no probable cause justifying the seizure and arrest of the defendant for operating a motor vehicle while under the influence of drugs or to search the car for drugs or drug paraphernalia.

The judgment is reversed, except as to the defendant's seat belt infraction, and the case is remanded with direction to grant the defendant's motions to suppress.

In this opinion the other judges concurred.